UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

**MARYLAND CONGRESS OF PARENTS
AND TEACHERS, INC.,**

Plaintiff

v.

**NATIONAL CONGRESS OF PARENTS
AND TEACHERS, INC.,**

Defendant

**Case No.  1:20-cv-02875-CCB**

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

Defendant National Congress of Parents and Teachers, Inc. ("National PTA"), by and through undersigned counsel, submits this Memorandum of Law in Support of its Motion to Dissolve Temporary Restraining Order. As set forth below, pursuant to Federal Rule of Civil Procedure 65, Plaintiff's failure to satisfy the standard for imposing the extraordinary remedy of a temporary restraining order warrants dissolution of the order entered by the state court.

## INTRODUCTION

National PTA is a corporation registered in Washington, DC whose purpose is to support and advocate for students regarding educational issues. National PTA owns the "PTA" brand and licenses it to state affiliates. These state affiliates are independent business entities which are contractually permitted to use the PTA brand and National PTA's resources so long as they comply with National PTA's Standards of Affiliation. The state affiliates assist parents, teachers, and students in creating local-level PTAs ("Local PTAs"), which are also independent business

entities. The state affiliates collect dues from members of the Local PTAs; the dues are split between the state affiliate and National PTA.

Plaintiff Maryland Congress of Parents and Teachers, Inc. ("Maryland PTA") is a state affiliate which, pursuant to a contract with National PTA, is permitted to use the PTA brand in the State of Maryland. Since sending a Letter of Inquiry on March 30, 2020, National PTA has investigated and implemented disciplinary action against Maryland PTA pursuant to its Standards of Affiliation. Maryland PTA's Board of Directors[1] has complied in part but has disputed or refused to comply with various demands by National PTA. Maryland PTA filed its complaint in the case at bar in the Circuit Court for Anne Arundel County, Maryland ("State Court") on September 1, 2020. On September 8, 2020, Maryland PTA filed a motion requesting a temporary restraining order ("TRO") and, after an adversary hearing, *permanent* injunctive relief. Ex. A, *Maryland Congress of Parents and Teachers, Inc. v. National Congress of Parents and Teachers, Inc.*, Circuit Court for Anne Arundel County, Case No. C-02-CV-20-001691, Motion for a Temporary Restraining Order and Other Injunctive Relief, filed September 8, 2020. It alleged that National PTA's disciplinary action constituted tortious interference and breach of contract. Based on *ex parte* findings, the State Court issued a TRO on September 17, 2020. Ex. B, *id.*, Temporary Restraining Order, docketed September 17, 2020. On October 5, 2020, National PTA filed notice of removal to this Court.

For more than six months, National PTA has sought cooperation from Maryland PTA in its investigation and remediation of Maryland PTA's organizational issues. Facing increasing pressure from both Local PTAs and National PTA as well as resignations by its own board

---

[1] Members of Maryland PTA's current Board of Directors, not its general membership, have taken the actions at issue in this case. For textual simplicity, unless otherwise specified, actions by the Maryland PTA Board of Directors shall be attributed to "Maryland PTA."

members, Maryland PTA has resorted to litigation to delay or permanently eliminate its contractual obligation to comply. Maryland PTA has no reasonable chance of proving the claims for which it obtained a TRO: tortious interference and breach of contract. The other factors required for issuance of injunctive relief have not been satisfied. Because Maryland PTA has not met the applicable standard for the extraordinary remedy of injunctive relief, the TRO must be dissolved.

## STANDARD OF REVIEW

The State Court entered a TRO which is effective until October 22, 2020. When a case is removed to federal court, orders entered in the state court remain in effect as entered, but federal law governs their dissolution or modification. *Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 436–37 (1974). In federal court, TROs are governed by Federal Rule of Civil Procedure 65(b). Under that Rule, the adverse party to a TRO can move to dissolve or modify the TRO "On 2 days' notice to the party who obtained the order without notice." Rule 65(b)(4). National PTA provided Maryland PTA with appropriate notice on October 7, 2020.

"A preliminary injunction is an extraordinary remedy, to be granted only if the [party seeking an injunction] clearly establishes entitlement to the relief sought." *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997). The same factors apply to issuance of both a TRO and a preliminary injunction. *Id.* "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

Each of the four factors at issue weighs against Maryland PTA. Most importantly, Maryland PTA cannot show that it is likely to succeed on the merits of its claims. The other three

factors have not been established, as equity favors National PTA. Thus, the TRO must be dissolved so that National PTA can continue to exercise its contractual rights and control of its brand and resources.

I.     Plaintiff is Unlikely to Succeed on the Merits of its Tortious Interference Claim

Beginning with the likelihood of success on the merits, Maryland PTA's claims are facially defective and are not likely to result in a finding in its favor. Maryland PTA's first claim is tortious interference. Maryland law recognizes two types of tortious interference: (1) inducing a breach of contract and (2) maliciously interfering with economic relationships in the absence of a breach of contract. *Kaser v. Fin. Prot. Mktg.*, 376 Md. 621, 628 (2003). The elements for either version of the claim are as follows: "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Id.* at 628–29. The third element is also described as "the absence of a legitimate business purpose." *B-Line Med., LLC v. Interactive Digital Solutions, Inc.*, 209 Md. App. 22, 49–50 (2011).

The Maryland Court of Appeals has held repeatedly that "[f]or the tort to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered." *Travelers Indem. Co. v. Merling*, 326 Md. 329, 343 (1992); *Kaser*, 376 Md. at 6230 (surveying Court of Appeals holdings). In *Kaser*, the plaintiff insurance agent brought a tortious interference claim against an insurance company for interfering with the agent's relationship with his customer, an insured party. *Kaser*, 376 Md. at 638–39. The Court of Appeals was asked in a certified question to decide whether Maryland law permitted the claim *Id.*

4

Before issuing its holding, the Court summarized the holdings of several of its prior cases on this issue, which included cases of both types of tortious interference. *Id.* at 629–30, 636–37. The Court of Appeals cited with approval the concurring opinion in *Medical Mutual v. Evander*, 339 Md. 41 (1995). In that case, the concurrence stated that the plaintiff insurance agents could not pursue a claim of tortious interference because "the business relationships among the agent, the insureds, and the insurer Medical Mutual were not independent, but rather 'were bound up in the policies issued by Medical Mutual." *Kaser*, 376 Md. at 636 (*quoting Evander*, 339 Md. at 62). Similarly, in *K&K Mgmt. v. Lee*, 316 Md. 137 (1989), the plaintiff restaurant owners could not pursue a tortious interference claim against their landlord for interfering with their economic relations to their customers, as "the relationship between the [owners] and their customers was entirely dependent upon the contract between [the landlord] and the [owners]." *Kaser*, 376 Md. at 636. Based on these earlier holdings, the *Kaser* Court held that the insurance agent could not bring a tortious interference claim because "the relationship that [agent] had with [customer] was entirely dependent upon and bound up with the contractual relationship between the insurer" and the customer. *Id.* at 638–39. Based on the answer to the certified question, the United States District Court for the District of Maryland dismissed the complaint. *Kaser v. Protective Life Ins. Co.*, 282 F. Supp. 2d 353 (Dist. Md. 2003).

National PTA permits state affiliates to use its branding, organize local PTAs, and collect dues so long as they "remain in compliance with the Standards of Affiliation, the Requirements, and the Procedures." Ex. C, Memorandum of Understanding, at 1. These are defined expressly as "privileges of affiliation with the National PTA." *Id.* Such privileges are only available "in exchange for [Maryland PTA]'s acknowledgments and agreements contained" in the Memorandum of Understanding. *Id.* Thus, Maryland PTA has expressly agreed that its relationship

with Local PTAs is a privilege of its affiliation, conditioned on its compliance with the contract between it and National PTA.

Maryland PTA did not state plainly in its Complaint which type of tortious interference claim it was pursuing. Regardless, Maryland law is clear that in either type of claim, the defendant cannot be a party to the relationship at issue. If Maryland PTA claims that National PTA interfered with National PTA's own contractual or economic relationship, the claim must fail. If Maryland PTA claims that National PTA interfered with Maryland PTA's contractual or economic relationship with Local PTAs, the claim must fail—any relationship between Maryland PTA and Local PTAs is "entirely dependent upon" and "bound up with" Maryland PTA's contractual relationship with National PTA. *Kaser*, 376 Md. at 638–39.  To allow the claim to proceed would be to transform a breach of contract action between National PTA and Local PTA into a separate intentional tort claim, a result not permitted under Maryland law. *Kaser*, 376 Md. at 629. Moreover, for the reasons set forth below, National PTA had a legitimate business purpose for its actions, which is itself wholly sufficient to defeat the tortious interference claim. Plaintiff cannot establish that it is likely to succeed in prosecuting this claim.

II.  <u>Plaintiff is Unlikely to Succeed on the Merits of its Breach of Contract Claim</u>

Plaintiff's second claim is for breach of contract. Maryland courts define breach of contract as "a failure, without legal excuse, to perform any promise that forms the whole or part of a contract." *Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16, 51 (2007). A contractual "promise" is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promise in understanding that a commitment has been made." *Id.* Maryland interprets contracts based on their objective language. *Id.* at 50.

6

Maryland PTA has not identified clearly (in any of its filings in this case) which contract between it and National PTA it alleges was breached, much less the specific contractual promise that was breached. Regardless, the complained-of actions taken by National PTA are provided for in the contract between Maryland PTA and National PTA, and National PTA has not breached any contract. As part of the affiliation agreement, Maryland PTA and National PTA signed a Memorandum of Understanding ("MOU"). Ex. C. The MOU defines the duties of the two organizations in the context of the affiliate relationship. In exchange for the privileges of affiliation, Maryland PTA agreed as follows:

> "By signing this MOU, [Maryland PTA] . . .
> b. Acknowledges that [Maryland PTA]'s board of directors has received, read, understands and agrees to be bound by, and/or comply with, the Standards of Affiliation ("SOA" or "Standards") including the applicable required indicators contained in the Standards of Affiliation Requirements ("Requirements"), and the Noncompliance Procedures (the "Procedures")."

Ex. C, at 2. The Procedures incorporated by the MOU provide National PTA with the ability to mandate Maryland PTA's compliance with its Standards. Ex. D, National PTA Non-Compliance Procedures, January 2020. Pursuant to the Procedures, "[i]f it has been determined that a state [affiliate] has not complied with any portion of" National PTA's Standards of Affiliation, National PTA may proceed through a series of disciplinary measures, culminating in revocation of the state affiliate's license to use the PTA brand. *Id.*, § II.

The Procedures contemplate a "Notification Phase" in which the state affiliate is notified that it has not complied with the Standards of Affiliation ("Standards") and is provided with a deadline for achieving compliance. *Id.*, § I.A. If, during the period of non-compliance, National PTA learns of additional instances of non-compliance, it may issue further notice and an additional deadline to the state affiliate. *Id.*, § I.C. **If National PTA determines that the affiliate failed to**

comply by the expiration of a Notification Phase deadline, National PTA can place Maryland PTA in *any* of the disciplinary statuses provided for in the MOU. *Id.*, § II.B.3. If it determines that a certain disciplinary procedure is necessary based upon any one of several possible considerations, National PTA is under no obligation to proceed through the stages of discipline in the order they are set forth. *Id.*, § II.C. Affirming National PTA's intention in the MOU to protect its brand to the greatest extent possible, if National PTA determines at any time that the state affiliate *may* engage in conduct that *may* cause "material harm to the value and goodwill associated with the PTA Trademarks or brand," the MOU permits National PTA to revoke its affiliate's charter at any time upon notice to the state affiliate. *Id.*, § VI.

The plain text of the MOU and the Procedures contrasts sharply with the way Maryland PTA framed the issue in its Motion, alleging that National PTA has not allowed Plaintiff "due process" and referring vaguely to violation of bylaws. Ex. A, at 7. Setting aside the fact that Maryland PTA has not pointed to the source of this due process requirement and that no such requirement exists in the text of either organization's bylaws,[2] Maryland PTA's version of its agreement with National PTA ignores the plain text of the contract between the parties: if National PTA determines subjectively that Maryland PTA has failed to comply at the Notification Phase *or* that it has placed the PTA brand in jeopardy, National PTA can move forward with the disciplinary measure of its choice. Maryland PTA agreed to this disciplinary authority when it agreed by

---

[2] Moreover, due process is a constitutional limitation on state action and is typically inapplicable to private contracts. *Nat'l Collegiate Ath. Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988); *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 307–08 (1991), *citing Meleen v. Hazelden Foundation*, 740 F.Supp. 687, 692 (D.Minn.1990) ("Plaintiff got all the procedure she was due under the employment contract. She, perhaps understandably, would like something more. But, this was a private contract; no right to constitutional due process or proof beyond a reasonable doubt existed. Plaintiff's private expectations and due process concepts are not part of the employment contract.").

contract to become part of the PTA organization and receive the privilege of using the PTA brand. Maryland PTA is now bound by its agreement.

As Maryland PTA discusses in its Motion, National PTA has requested changes to Maryland PTA's procedures and bylaws to remediate the ongoing harm to its brand. National PTA has proceeded through the disciplinary steps provided for in the MOU, in the order provided for. However, National PTA was not obligated to do so. As of May 20, 2020, National PTA had notified Maryland PTA in writing that the actions complained of by the leaders representing "more than two-thirds of the local PTAs in Maryland and more than seventy-five percent of Maryland's PTA membership" were causing "harm to the PTA name and loss of goodwill." Ex. E, Letter to Maryland PTA Board of Directors, May 20, 2020, at 1–2.[3] As National PTA stated in its letter, *id.* at 2, and as set forth above, *this determination alone* entitled National PTA to take any of the disciplinary action set forth in the MOU, in whatever order National PTA determined was necessary.

Maryland PTA has not identified with adequate specificity what breach of contract it alleges. Similarly, it has not identified with any specificity the source of the "due process" which it alleges National PTA owed it in enforcing a private contract. Ex. A, at 7. Regardless, the plain text of the contract between the parties permits the actions complained of. National PTA is permitted to take disciplinary action if it determines (subjectively) that its brand is in jeopardy, and it has plainly done so here. Ex. C, § 2(b); Ex. D, § II.C. Whether because of the inadequate pleading or because of the plain text of the contractual provisions at issue, Maryland PTA has not

---

[3] As set forth in further detail below, National PTA's good-faith course of conduct was also supported by resignation letters from former members of Maryland PTA's Board of Directors. The letters set forth various actions taken by members of the Board of Directors which National PTA reasonably believes to be harmful to its brand and to Maryland PTA as a whole.

demonstrated that it is likely to succeed on the merits of a breach of contract claim. As Maryland PTA has failed to establish that it is likely to succeed on the merits of *either* of its claims, the injunction must be dissolved.

III.    Plaintiff has not Demonstrated the Other Requirements for Injunctive Relief

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). As set forth above, Maryland PTA's failure to establish that it is likely to succeed on the merits warrants dissolution of the TRO. Separately, dissolution is warranted because Maryland PTA has failed to establish any of the other three factors. Failure to establish any one of the factors is itself sufficient to warrant dissolution of the TRO.

Regarding the likelihood of suffering irreparable harm, Maryland PTA has not established any irreparable harm it will suffer in the absence of an injunction. It refers vaguely to noncompliance by local PTAs, local PTAs contacting the press, and National PTA preventing it from "duly executing its operations." Ex. A, at 15. First, enjoining *National PTA* from continuing the disciplinary process will not stop *Local PTAs* from taking any action, nor will it stop members of the press from reporting on Maryland PTA's actions. Second, Maryland PTA has not stated what harm it will suffer if it is forced to comply with its contractual obligation to proceed through the disciplinary process. In fact, National PTA has not required any action likely to cause any harm to Maryland PTA, much less *irreparable* harm. *See* Ex. F, Letter from National PTA to Maryland PTA Board of Directors, August 26, 2020 (requesting that per MOU, National PTA be given *control* of Maryland PTA communications and assets for duration of Restructuring Phase). Stated differently, this is not a case in which a building will be demolished if the injunction is lifted.

Maryland PTA will simply need National PTA's permission to take various actions using the PTA brand until it returns to compliance with its contractual obligations.

Turning to the balance of equities, National PTA is the party favored by equity. In support of its noncompliance and its claims, Maryland PTA offers only vague predictions of organizational harm due to a perceived lack of "due process." In contrast, National PTA has attempted for over six months to exercise its contractual rights to control the use of its brand. National PTA has done so in good faith *and at the behest of the very Local PTAs Maryland PTA claims to protect.* National PTA's actions were also supported by letters from members of Maryland PTA's own Board of Directors, several of whom resigned rather than participate in what they believed to be a course of conduct harmful to Maryland PTA, its members, and the organization's mission to represent Maryland schoolchildren. Three of the resignation letters which were sent to National PTA are attached hereto. Ex. G, Resignation Letters of Maryland PTA Board Members. In these letters, the resigning Board members set forth a course of conduct harmful to Maryland PTA and the PTA brand, supporting National PTA's good-faith attempts to remedy the problems.

Moreover, National PTA already suffers more harm from this matter than Maryland PTA. The longer Maryland PTA avoids compliance with its obligations, the more National PTA stands to lose the goodwill associated with its global brand. From a purely mathematical perspective, for each Local PTA that leaves the PTA brand, National PTA loses a greater amount of annual dues ($2.25 per member) than does Maryland PTA ($2.00 per member). Ex. H, Maryland PTA, *About MDPTA: What Does It Cost?*, mdpta.org (October 9, 2020, 3:10 PM), https://mdpta.org/about/. In essence, for any harm that Maryland PTA believes it has incurred or will incurred, National PTA suffers the same or greater harm. It would therefore be inequitable to reward Maryland PTA's obstructionism with continued injunctive relief. The balance of equities favors dissolving the TRO.

Finally, the public interest favors dissolution of the TRO. Maryland PTA's approximately 130,000 members are dues-paying constituent members of National PTA. Many members have expressed to National PTA that Maryland PTA's conduct has prevented them from conducting business as is necessary and appropriate, particularly during the COVID-19 pandemic. Perhaps the primary issue at stake for the public is Maryland PTA's refusal to interpret its bylaws to allow electronic voting amid current social distancing requirements. In addition to National PTA's request that it do so, Local PTAs have requested this, as has the President of the Maryland Senate and a delegation from the Maryland House of Representatives, who explained to Maryland PTA that "many other nonprofit organizations" in Maryland have interpreted their own bylaws to permit electronic voting. Ex. I, Letter from Maryland Legislators to Dr. Edna Battle, August 21, 2020. Rather than comply with its obligations and requests from those above and below it in the PTA organization, Maryland PTA sought a *permanent injunction*, apparently forever barring National PTA from controlling the use of its brand in Maryland. It is in the public interest for the Court to dissolve the TRO and allow National PTA to continue its efforts to resolve Maryland PTA's organizational issues.

## CONCLUSION

Pursuant to United States Supreme Court case law, Plaintiff Maryland PTA cannot satisfy the requirements to maintain a TRO (or any other injunctive relief) under Federal Rule of Civil Procedure 65. It is highly unlikely to succeed in its claims, one of which is impermissible under Maryland law and the other of which is inadequately supported even in the current procedural posture. It has failed to demonstrate likely irreparable harm and is unsupported by the balance of equities, and awarding it "extraordinary" injunctive relief is contrary to the public interest. Its case fails to satisfy any of the four factors required, and failure to satisfy any one of the four is

dispositive of injunctive relief. The Court must dissolve the TRO so that National PTA can govern its affiliate's use of the PTA brand in accordance with the contract between them pending resolution of Maryland PTA's claims.

Respectfully submitted,

/s/Eric M. Rigatuso
Eric M. Rigatuso (Bar No. 27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of October, 2020, copies the foregoing Defendant's Memorandum of Law in Support of its Motion to Dissolve Temporary Restraining Order were served via the Court's electronic filing system on:

Charles Tucker, Jr.
TUCKER MOORE LAW GROUP
8181 Professional Place, Suite 207
Hyattsville, MD 20785
301-577-1175
charles@tuckerlawgroupll.com
*Attorney for Plaintiff*

/s/Eric M. Rigatuso
Eric M. Rigatuso (Bar No. 27605)